## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-60405-CIV-ALTMAN/Hunt

**NATIONAL HEALTH FINANCE DM, LLC,**

     *Plaintiff*,

*v.*

**SEA SPINE ORTHOPEDIC INSTITUTE, LLC,**
*and* **ANDREW JOSHUA APPEL,**

     *Defendants.*

_____/

### ORDER

The Plaintiff signed several contracts with the Defendants. When the Defendants refused to pay what they owed, the Plaintiff sued them here. Now, after some litigation, the Plaintiff has moved for summary judgment. *See* Motion for Summary Judgment ("MSJ") [ECF No. 45].[1] In response, the Defendants advance a new argument they've never made before: that they owe the Plaintiff *less* than the Plaintiff demanded because they only signed the last of the parties' contracts as a result of a unilateral mistake. *See generally* Response. Unfortunately for the Defendants, we see two dispositive problems with their new theory. *One*, a party cannot survive summary judgment by pressing a defense it never asserted in its pleadings. *Two*, Arizona law—which governs this dispute—requires a party alleging unilateral mistake to show that its counterparty *knew* about the mistake and purposefully took advantage of it. As we're about to see, the Defendants have *no evidence* that the Plaintiff knew about their (alleged) mistake, which is really the end of that. We thus **GRANT** the Plaintiff's MSJ and enter judgment against the Defendants.

---

[1] The MSJ is ripe for resolution. *See* Response [ECF No. 52]; *see also* Reply [ECF No. 63].

THE FACTS[2]

In January 2012, our Plaintiff, National Health Finance DM, LLC ("NHF"), and Sea Spine Orthopedic Institute, LLC ("Sea Spine") signed a Medical Lien Servicing Contract (the "Original Agreement"). *See* Joint Statement of Undisputed Facts (the "Joint SOF") [ECF No. 43] ¶ 1. Under this Original Agreement, NHF purchased certain accounts and medical liens from Sea Spine. *Id.* The agreement required Sea Spine to act as NHF's collection agent for the accounts, to collect all amounts due under those accounts, and to remit any payments stemming from the accounts directly to NHF. *Id.* ¶ 2. Sea Spine also guaranteed that it would make certain minimum payments to NHF and that, if those minimum payments weren't made, Sea Spine would have to make up the difference by *either* sending NHF a lump payment *or* assigning additional accounts to NHF. *Id.* ¶ 3. Although the Original Agreement was later amended, those amendments didn't modify Sea Spine's obligation to collect on the accounts or to remit payments to NHF. *Id.* ¶¶ 4–5.

During the parties' relationship, Sea Spine failed to comply with its obligations under the Original Agreement. *Id.* ¶ 6. And so, the parties entered into a new agreement—the Superseding Medical Lien Servicing Agreement (the "Original Superseding Agreement"), which replaced and superseded all previous agreements between the parties. *Id.* ¶¶ 7–8. The Original Superseding Agreement acknowledged that Sea Spine breached its obligations for those accounts it had assigned to NHF *before* February 1, 2014; set forth new obligations and payment terms relating to those pre-

---

[2] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)).

February 1, 2014 accounts (including a guarantee that NHF would receive payment of at least $4,735,388.80 on those accounts); and outlined the terms under which Sea Spine would assign future accounts to NHF. *Id.* ¶¶ 10–12. In this Original Superseding Agreement, Sea Spine also guaranteed that NHF would receive, within two years of an advance NHF paid, twice the advance amount as a minimum payment on that account. *Id.* ¶ 13; *see also* Defs.' SOF ¶ 13. Sea Spine then agreed to make up any difference between the agreed minimum payment amount and the amounts NHF had actually received by *either* paying the balance in cash *or* assigning additional accounts to NHF. *See* Joint SOF ¶ 13; *see also* Defs.' SOF ¶ 13.

Once again, Sea Spine failed to meet its contractual obligations. *See* Joint SOF ¶ 14. Specifically, it didn't collect (or remit) the required minimum payments by the second year after NHF's advance. *Id.* To address these defaults—and to give Sea Spine yet another chance to comply with its obligations—the parties amended the Original Superseding Agreement four more times: on April 30, 2016; September 28, 2018; July 31, 2019; and April 22, 2020. *Id.* ¶ 15.

In the first of these—formally, the Amended Superseding Medical Lien Servicing Contract (the "Amended Superseding Agreement"), signed on April 30, 2016—the parties agreed that, for accounts sold and assumed by NHF "prior to May 1, 2016," Sea Spine owed NHF "a total of $8,687,280.68." Amended Superseding Agreement [ECF No. 33] at 14 ¶ 3(d).[3] They also stipulated that, to resolve past-due amounts for accounts NHF acquired *before* May 1, 2016, Sea Spine would pay NHF (and NHF would accept) $6,949,824.54—all according to an agreed-upon payment schedule. *Id.* at 14 ¶ 3(e). That payment schedule required Sea Spine to pay NHF $3,474,912.27 by March 31, 2017, and an additional $3,474,912.27 by December 31, 2017. *Id.* at 14 ¶ 3(f). If Sea Spine failed to make

---

[3] Because all the agreements were filed as a single docket entry, we cite to the page numbers of the PDF rather than the page numbers of the individual documents and include the paragraph number where available.

these payments, it would owe the "full amount of $8,687,280.68" on April 30, 2018. *Id.* at 15 ¶ 3(f). In the Amended Superseding Agreement, the parties also stipulated to the terms that would govern NHF's purchase of Sea Spine accounts *after* May 1, 2016—including the different advance rates that would apply to the various account types. *See* Joint SOF ¶ 19. Sea Spine failed to pay the full amount due under the Amended Superseding Agreement by the specified dates. *Id.* ¶ 20.

In the second such amendment—formally, the First Amendment to the Amended Superseding Medical Lien Servicing Contract (the "First Amended Superseding Agreement"), signed on September 28, 2018—the parties agreed that Sea Spine had breached the payment schedule outlined in the Amended Superseding Agreement. *Id.* ¶ 21. They thus stipulated to a new payment schedule. *Id.* ¶ 22–23. Ultimately, Sea Spine made *some* payments in accordance with this new payment schedule, but it failed to make *all* the payments as required. *Id.* ¶ 24.

Given Sea Spine's failure to comply with the payment schedule set out in the First Amended Superseding Agreement, the parties executed a third amendment—the Superseding Medical Lien Servicing Contract (the "Second Amended Superseding Agreement"), signed on July 31, 2019. *Id.* ¶ 25. In this Second Amended Superseding Agreement, the parties stipulated that Sea Spine owed NHF $6,483,514.31. *See* Second Amended Superseding Agreement [ECF No. 33] at 31 ¶ I; *see also* Joint SOF ¶ 26. They also set out a new payment schedule. *See* Second Amended Superseding Agreement at 31–32; *see also* Joint SOF ¶ 26. Once again, however, Sea Spine made *some* payments under the updated payment schedule but failed to make all the required payments. *See* Joint SOF ¶ 27.

And this brought the parties to their final agreement—the Third Amended Superseding Medical Lien Servicing Contract (the "Third Amended Superseding Agreement"), signed on April 22, 2020. *Id.* ¶ 28. Dr. Andrew Joshua Appel—Sea Spine's sole owner and member—signed the agreement

*both* individually *and* as Sea Spine's representative.[4] *Id.* ¶ 29. In it, Appel agreed that he and Sea Spine would be jointly and severally liable for all obligations arising under the Third Amended Superseding Agreement. *See* Third Amended Superseding Agreement at 37. According to the Defendants, when the parties entered into this agreement, Sea Spine "had not conducted an audit of the many thousands of accounts on multiple dates of patient service that it sold to NHF, the amounts of NHF's advances to [Sea Spine] to purchase each account[,] and the amounts [Sea Spine] collected and remitted to NHF under the parties' agreement for [Sea Spine] to provide servicing of the accounts for NHF." Declaration of Mark Seda [ECF No. 50-1] ("Seda Decl.") ¶ 6.[5] Sea Spine says that NHF "required" it to enter into this agreement "on an expedited basis such that [Sea Spine] was unable to complete an audit of accounts before signing" the agreement. *Id.* Sea Spine further alleges that, when it and Dr. Appel executed the Third Amended Superseding Agreement, they "were aware that payments were made by [Sea Spine] to NHF and that NHF failed to properly apply [Sea Spine's] payments or otherwise properly account for [Sea Spine's] payments as required by the parties' agreement; however, [Sea Spine] was unable to complete its analysis"—and so, the Defendants "were mistaken about what [Sea Spine] owed to NHF" when they agreed to the sums outlined in the final agreement. *Id.* NHF's response to all this is to point out that, "[a]t no time prior to the Defendants' execution of the Third Amended Superseding Agreement[,] did [the] Defendants ever notify NHF that they were unaware of

---

[4] There's a dispute about whether Dr. Appel signed the agreements as Sea Spine's CEO. *Compare* Complaint [ECF No. 1] ¶ 19 ("Appel signed the Superseding Agreement as both Sea Spine's CEO and individually thereby agreeing that both Sea Spine and he personally are jointly and severally liable for all amounts due and owing under the Superseding Agreement."), *with* Answer [ECF No. 18] ¶ 19 ("Defendants deny that Appel held the Position of CEO at Sea Spine."). But, because both parties agree that Dr. Appel signed the agreement *both* individually *and* on behalf of Sea Spine, that discrepancy doesn't matter much for our purposes. *See* Answer ¶ 19 ("Defendants admit that Appel signed the Amended Superseding Amendment on behalf of Sea Spine, as its sole owner and member, and individually.").
[5] Mark Seda calls himself "the Chief Executive Officer ('CEO') of Defendant Sea Spine Orthopedic Institute, LLC[.]" Seda Decl. ¶ 1.

the amounts due and owing to NHF or that they were in need." Declaration of Richard Cruz [ECF No. 64] (the "Cruz Decl.") ¶ 11.[6]

In the Third Amended Superseding Agreement, Sea Spine agreed to a "recital," which made clear that Sea Spine had told NHF that it had been unable to make the payments that came due in March 2020, April 2020, and May 2020—as required in the Second Superseding Agreement. *See* Joint SOF ¶ 30; *see also* Third Amended Superseding Agreement at 37–38 (the recital). The parties also stipulated that Sea Spine owed NHF $6,483,514.31 for past-due accounts. *See* Third Amended Superseding Agreement at 38 ¶ 1. And they outlined yet another payment schedule, which included prior payments Sea Spine made through February 15, 2020, and which didn't require Sea Spine to make additional payments in March, April, or May of 2020. *See* Joint SOF ¶¶ 31–33. Instead, Sea Spine's first payment (of $225,000) would become due on June 15, 2020. *Id.* ¶ 34. The problem is that, on that day, Sea Spine paid NHF just $75,000. *Id.* Two months later—on August 15, 2020—Sea Spine paid an additional $5,000, but it made none of the additional payments required by the Third Amended Superseding Agreement. *Id.* ¶ 35. It did, however, remit payments from monies it collected on the assigned accounts—totaling some $50,525.03. *Id.*

On December 29, 2020, not content to let Sea Spine drag things out any further, NHF served Sea Spine with a formal Notice of Default and Demand for Payment, informing Sea Spine and Dr. Appel of their default and providing them with an opportunity to cure. *Id.* ¶ 36; *see also* Notice of Default [ECF No. 33] at 44–45. In response, Sea Spine and Dr. Appel did (essentially) nothing. *See* Joint SOF ¶ 37. Left with little choice, NHF brought this breach-of-contract case against Sea Spine and Dr. Appel. *Id.*

---

[6] Richard Cruz says that he's "the General Counsel and Chief Operating Officer of Plaintiff National Health Finance DM, LLC[.]" Cruz Decl. ¶ 1.

As we've suggested, the Defendants offer up only one defense: unilateral mistake. And they're fairly transparent about *when* they discovered their mistake—during the discovery phase of this case. *See* Seda Decl. ¶ 7. Based on the documents NHF produced, Sea Spine "was able to begin its own analysis of [its] Business Records of the number of advances from NHF to [Sea Spine] and payments from [Sea Spine] to NHF[,] and [to] compare NHF's analysis with [its own] Business Records." *Id.* Comparing NHF's records with its own, Sea Spine identified several discrepancies. *See id.* ¶¶ 8–11; *see also* Audit Summary [ECF No. 50-1] at 6.[7] Based on these discrepancies, Sea Spine determined that, "[s]ince [it] repaid NHF a total of $16,670,069.64, the net amount [it] owed [to] NHF is $3,482,321.62 . . . not the amount NHF [claims] is owed under the parties' agreement." Seda Decl. ¶ 12.

The parties now dispute whether the Third Amended Superseding Agreement is enforceable given the Defendants' (claimed) unilateral mistake. *Compare* MSJ at 4–5 ("[The] Defendants' remaining debt to NHF according to the Third Amended Superseding Agreement is $8,549,726.67, including contractual interest."), *with* Response at 5 ("NHF is not entitled to the entry of final summary judgment against [Sea Spine] and Appel because the Third Amended Superseding Agreement is unenforceable under applicable Arizona law based on [Sea Spine] and Appel's unilateral mistake.").

One thing the parties do agree on, though, is that Arizona law governs this dispute. *See* MSJ at 6 ("The Agreement is governed by Arizona law."); Response at 3 ("[Sea Spine] does not dispute that Arizona law applies.").[8] So, here we are.

---

[7] The Audit Summary is an exhibit to the Seda Declaration and appears in the same docket entry.

[8] *See also* Joint SOF ¶ 39 ("The Original Superseding Agreement and [the First Amended Superseding Agreement] state that the agreements are governed by, and shall be construed, interpreted, and enforced in accordance with the laws of the State of Arizona. The [other agreements] do not; however, these three agreements state that unless modified therein, the provisions of prior agreements are unmodified and in full, force and effect.").

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting Fed. R. Civ.

P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, "if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Torres v. Wal-Mart Stores E., LP*, 555 F. Supp. 3d 1276, 1282 (S.D. Fla. 2021) (Altman, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

As we've hinted, the parties agree on *almost* everything. The facts are undisputed. So is the law. But, in responding to the MSJ, the Defendants do dispute one thing—how much they owe the Plaintiff. In a nutshell, their argument is this: Because of their unilateral mistake—a mistake that implicates only the last contract (what we're calling the Third Amended Superseding Agreement)— the Defendants should be absolved of *some* of their obligations under the contract and, as a result, owe the Plaintiff less than it's asking for. *See* Response at 3–5. The Plaintiff disagrees for two main reasons—*first*, because the Defendants have waived their mistake defense by failing to raise it earlier in the litigation, Reply at 4–6; and, *second*, because unilateral mistake wouldn't render the contract unenforceable in the circumstances of this case, *id.* at 6–8. We address each argument in turn.

### A.    Waiver

"Under Federal Rule of Civil Procedure 8(c), defendants are required to 'affirmatively state any avoidance or affirmative defense' in their pleadings." *Keyband Nat'l Ass'n v. Hamrick*, 576 F. App'x

884, 888 (11th Cir. 2014) (quoting FED. R. CIV. P. 8(c)(1)). "Failure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010); *see also Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) ("[T]he general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial."). As relevant here, when a defendant first raises an affirmative defense at summary judgment, that defendant's "failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense." *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991) (citing *Morgan Guar. Tr. Co. of N.Y. v. Blum*, 649 F.2d 342, 345 (5th Cir. 1981)); *see also Ross v. Chisholm*, 2006 WL 8432311, at *5 (S.D. Fla. Apr. 28, 2006) (Cohn, J.) ("[A] defendant cannot raise an affirmative defense for the first time in a response to a summary judgment motion unless the response is the defendant's first pleading in the matter. Many of these defenses are therefore waived, unless [the] Defendants should later amend their pleadings."). That said, "[a] court *may* consider an affirmative defense that did not appear in the answer, *if* the plaintiff has suffered no prejudice from the failure to raise the defense in a timely fashion." *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353 (11th Cir. 2001) (emphases added).

Our Defendants didn't assert unilateral mistake as a defense until they responded to the MSJ. *See generally* Docket; *see also* Response at 3–5 (arguing, for the first time, that the Third Amended Superseding Agreement isn't enforceable because of the Defendants' unilateral mistake). Recognizing this problem, the Defendants now insist that they *did* advance unilateral mistake as a defense in their Amended Answer—just not in so many words. In that Amended Answer, the Defendants "assert[ed] that they made payments to NHF that NHF failed to properly apply to the subject patient accounts and otherwise properly account for as required under the subject agreements[.]" Amended Answer

[ECF No. 36] at 8.[9] This "payments made" defense, the Defendants now maintain, was just their (abstruse) way of claiming unilateral mistake. *See* Response at 2 ("At the time [the] Defendants signed the Third Amended Superseding Agreement, [the] Defendants were aware th[at] [Sea Spine's] payments to NHF were not applied or properly applied to sold accounts. . . . [The] Defendants were mistaken about what [Sea Spine] owed NHF when they signed the Third Amended Superseding Agreement."); *id.* at 2 n.1 ("[The] Defendants' [*sic*] have raised the issue of NHF['s] failure to apply or improperly applied [Sea Spine's] payments to NHF in [the] Defendants' [Amended] Affirmative Defenses."). We're unconvinced.

We start with common sense: The Defendants were represented by seasoned lawyers. Unilateral mistake is one of those canonical defenses to contract formation that appears in every first-year contracts course. And it's so well-established in the lexicon of contract defenses that it finds its way into almost every breach-of-contract answer—not through cryptic assemblages of unrelated phrases (like "payments made"), but by the straightforward typing of two simple words: unilateral mistake. And it's undisputed that those two words appear nowhere in either of the Defendants' pleadings: not in the Original Answer and certainly not in the expanded (and now-operative) Amended Answer. Despite two bites at the apple, in other words, the Defendants now want us to believe that their experienced lawyers somehow intended to present the defense of unilateral mistake without ever actually saying so. That's nonsense.

---

[9] The Defendants also asserted this "payments made" defense in their original Answer. *See* Original Answer [ECF No. 18] at 7. In that Original Answer, the Defendants raised four defenses: payments made, setoff, usurious loan, and limitation of interest. *See id.* at 7. In the Amended Answer, they restated some of these and added others. The new expanded list of defenses included: payments made, setoff of assigned accounts, setoff and recoupment of unassigned accounts, usurious loan, limitation of interest, tortious interference, statute of frauds, and statute of limitations. *See* Amended Answer at 8–10. The Defendants don't suggest that any of these *other* defenses—that is, other than the "payments made" defense—could plausibly be construed as advancing the defense of unilateral mistake. *See generally* Response.

Logic aside, we know that the Amended Answer didn't assert the Defendants' new unilateral-mistake defense because that pleading includes none of the factual allegations on which the defense now relies. The "payments made" defense, in other words, simply alleged that NHF may not have properly accounted for all of Sea Spine's payments. *See* Amended Answer at 8. This is a fairly common affirmative defense, and it just isn't the same as unilateral mistake. When you get sued for non-payment on a contract, it's a valid defense to say: "yes, you're right; we didn't pay you what you're owed, but we did pay you something, so we owe you less than you think." That's the essence of the "payments made" defense. And it's in keeping with some of the other defenses Sea Spine asserted in both answers—including, as relevant here, the various setoff defenses we mentioned earlier, *see* note 9, *supra*. The point, though, is that unilateral mistake implicates a somewhat different concept—not so much that we've paid you part of what you say we owe (which is the province of "payments made"), but that, when we signed the contract, we didn't know what we were agreeing to. *See Ertl v. Ertl*, 502 P.3d 466, 472 (Ariz. Ct. App. 2021) ("A unilateral mistake is an erroneous belief of fact."); *see also* Restatement (Second) of Contracts § 151 (1981) cmt. a ("[T]he word 'mistake' is used to refer to an erroneous belief. A party's erroneous belief is therefore said to be a "mistake" of that party. The belief need not be an articulated one, and a party may have a belief as to a fact when he merely makes an assumption with respect to it, without being aware of alternatives. . . . [T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract.").

And, while we agree that it's possible to assert both defenses together—say, because the mistake inhered in a misunderstanding about how much had been paid and, thus, how much the defendant owed under the contract—the Amended Answer never suggests that the Defendants were in any way mistaken about what they owed. Remember, the word "mistake" never appears there. Put differently, as NHF points out, "notably absent [from the Amended Answer] are any facts that support the unilateral mistake defense asserted here—that NHF *forced* Defendants to sign the agreement on an

12

*expedited* basis, that Defendants did not have *sufficient time* to perform an audit, and that [the] Defendants were therefore unaware of the amounts owed to NHF at the time they executed the agreement." Reply at 4–5 (emphases added). Far from alleging mistake, in fact, the Amended Answer was clear that the "Superseding Agreement, amendments, and Third Amended Superseding Agreement *speak for themselves*"—as a result of which the Defendants specifically "den[ied] *any allegations* inconsistent" with those agreements. Amended Answer ¶ 61 (emphases added). Today, of course, the Defendants are suggesting that the agreements *don't* quite speak for themselves. They now insist, in other words, that extra-contractual clues—like the total number of agreements, the "expedited" way in which those agreements were signed, and the absence of any pre-agreement audit—are necessary to any proper understanding of what the parties, through the agreements, *intended* to convey. *See* Response at 3–5 (pointing to extra-contractual clues for their position that the contract is unenforceable due to Sea Spine's unilateral mistake). Nor are the Defendants still willing to "deny any allegations inconsistent" with the agreements. To the contrary, as we've seen, they now want to undo those agreements *precisely* because (they claim) those agreements don't *actually* reflect—read: are inconsistent with—the bargain the Defendants say they thought they were striking. Because the Defendants never raised unilateral mistake as a defense in their answer—indeed, because they said precisely the opposite—they cannot survive summary judgment by sandbagging the Plaintiff with it now.

We may (it's true) "consider an affirmative defense that did not appear in the answer if the plaintiff has suffered no prejudice from the failure to raise the defense in a timely fashion." *Miranda de Villalba*, 250 F.3d at 1353. But the Plaintiff would suffer extreme prejudice if we were to allow the mistake defense to proceed. Discovery, remember, closed more than two months ago. *See* Amended Scheduling Order [ECF No. 39] at 1 (resetting the discovery deadline to April 1, 2022). Had NHF known about this defense—a defense whose basic contours would've been readily available to the

Defendants from the moment the Complaint was filed[10]—NHF could have deposed witnesses with knowledge of the parties' pre-agreement positions; or it could have subpoenaed emails, text messages, and other records that might've shed light on what each side understood at the time the agreements were signed; or it might have retained an expert to explain why the Defendants' audit, had it been conducted, wouldn't have altered the parties' agreements. But the Plaintiff didn't get a chance to do any of these things because it didn't know that the Defendants would be relying on unilateral mistake at summary judgment. And it's now way too late to go back. *See Jameson v. Arrow Co.*, 75 F.3d 1528, 1534–35 (11th Cir. 1996) (district court didn't abuse its discretion by denying leave to amend "after [the plaintiff] retained counsel, discovery was closed, and the complaint had been amended twice, and [the defendant] had filed two motions for summary judgment," even though the plaintiff "was unable to obtain important information needed to pursue th[e] claim," because "it appear[ed] that the basic facts giving rise to the retaliation theory were available when the second amended complaint was filed"); *see also Saewitz v. Lexington Ins. Co.*, 133 F. App'x 695, 699–700 (11th Cir. 2005) (district court didn't abuse its discretion by denying leave to amend when "the district court was unwilling to reopen discovery, which the court ha[d] already extended for one month past the initial deadline" due to the plaintiff's "total lack of diligence" since the plaintiff "knew of and had documentation to support the facts underlying its newly-proposed affirmative defense before litigation even began"); *Hamrick*, 576 F. App'x at 888–89 ("By failing to assert their notice argument in any of their three answers, we conclude the Hamricks have waived this affirmative defense.").[11] Because the Defendants have waived

---

[10] Assuming that the Defendants *were* mistaken about the contract's terms, in other words, NHF's detailed allegations of non-payment—as outlined in the Complaint—should have immediately alerted them to the parties' divergent understandings.

[11] The Defendants never ask us to reopen discovery or to allow them to replead their affirmative defenses, *see generally* Response—so they've forfeited any such request, *see, e.g., United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances"); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d

any reliance on the unilateral-mistake defense—and since the Defendants raise no other defense to liability, *see generally* Response—we now **GRANT** the Plaintiff's MSJ.

### B.    The Merits

Even if the Defendants hadn't waived the unilateral-mistake defense, that defense would fail on the merits. Again, the parties agree that Arizona law governs this dispute. *See* MSJ at 6 ("The Agreement is governed by Arizona law."); Response at 3 ("[Sea Spine] does not dispute that Arizona law applies."). "A unilateral mistake is an erroneous belief of fact." *Ertl*, 502 P.3d at 472. Under Arizona law, "[a] mistake of only one of the parties to a contract in the expression of his agreement or as to the subject matter does not affect its binding force and ordinarily affords no ground for its avoidance, or for relief, even in equity." *Nationwide Res. Corp. v. Massabni*, 658 P.2d 210, 217–18 (Ariz. Ct. App. 1982). At the same time, "Arizona . . . recognizes that a unilateral mistake induced by misrepresentations or contractual ambiguities may constitute grounds for avoiding a [contract]." *Parrish v. United Bank of Ariz.*, 790 P.2d 304, 306 (Ariz. Ct. App. 1990). But "[a] party will be relieved from an agreement based on unilateral mistake *only if the other party knew of and unfairly took advantage of the other party's error*." *Hartford v. Indus. Comm'n of Ariz.*, 870 P.2d 1202, 1207 (Ariz. Ct. App. 1994) (emphasis added); *see also Ertl*, 502 P.3d at 472 ("To escape a contractual obligation because of a unilateral mistake of fact, a party must have made a mistake of fact about a material and basic assumption of an agreement, *and the other party knew of the mistake of fact and unfairly exploited* the other party's error[.]" (emphasis added & citations omitted)).

But the Defendants have no evidence *either* that NHF knew about their (supposed) mistake *or* that NHF unfairly exploited that mistake. They haven't, for instance, uncovered any NHF emails or

---

1324, 1330 (11th Cir. 2004) ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

phone messages that suggest NHF knew about the error, nor have they deposed any NHF witnesses whose testimony betrayed NHF's knowledge. And, to their credit, they never really suggest otherwise. Rather than give us evidence that NHF knew about their mistake, they offer up four (wholly inapposite) points of context.

*First*, they note that, when they "entered into the Third Amended Superseding Agreement, [Sea Spine] had not conducted an audit" of its NHF transactions. Seda Decl. ¶ 6. So what? Sea Spine's audit may have helped *Sea Spine* understand what Sea Spine owed NHF—but the absence of that audit tells us nothing about what *NHF* knew. And, again, the Defendants never argue that this missing audit proves anything about NHF's knowledge, *see generally* Response (never arguing that NHF knew about Sea Spine's supposed mistake), which is reason enough to disregard this first point, *see, e.g.*, *Campbell*, 26 F.4th at 873 (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue"); *Access Now*, 385 F.3d at 1330 ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

*Second*, the Defendants say that Sea Spine was only "able to begin its own analysis of [its] own Business Records" once the parties exchanged some discovery in this case. Seda Decl. ¶ 7. Again, irrelevant. Sea Spine's analysis of its own records—like the audit it wishes it had conducted—tells us only that (maybe) there were discrepancies between NHF's figures and Sea Spine's. And it's these discrepancies that Seda's declaration spends some time highlighting. *See generally* Seda Decl. (summarizing the discrepancies between the Defendants' and NHF's records *without* suggesting that NHF knew about those discrepancies). But the question under Arizona law isn't whether Sea Spine was mistaken. The question, as we've said, is whether NHF "knew of the mistake and unfairly exploited the other party's error[.]" *Ertl*, 502 P.3d at 472. And, on this crucial issue, Sea Spine's analysis of its own business records is neither here nor there.

16

*Third*, the Defendants claim that, during the discovery phase of this case, they for the first time realized that they owed NHF *less* than what they had promised to pay in the Third Superseding Agreement. *See* Seda Decl. ¶¶ 7–12 ("It was only after the NHF and [Sea Spine] exchanged documents and interrogatory responses in this case pursuant to discovery that [Sea Spine] was provided NHF's records of advances made to [Sea Spine] and payments remitted by [Sea Spine] to NHF. . . . Since [Sea Spine] repaid NHF a total of $16,670,069.64, the net amount owed NHF is $3,482,321.62 . . . not the amount NHF is claiming is owed under the parties' agreements." (citing the Audit Summary)). Again, this may be true—but it's irrelevant to the question we face today, which is whether NHF *knew* about this discrepancy and unfairly took advantage of it.

*Fourth*, the Defendants suggest that they were pressured into signing the Third Amended Superseding Agreement. Response at 4 ("Although Defendants were aware that [Sea Spine's] payments to NHF were not applied or improperly applied to sold accounts, [Sea Spine] was unable to complete its audit of the accounts to determine the exact amounts owed before signing the Third Amended Superseding Agreement because NHF required that such agreement be signed on an expedited basis."). For this proposition, though, they cite only Seda's declaration, which says that NHF "required" the Defendants "to enter into the Third Amended Superseding Agreement on an expedited basis[.]" Seda Decl. ¶ 6. Even accepting this as true—and NHF doesn't deny it—the record is clear that NHF wanted to move quickly "to provide Sea Spine with an opportunity to comply with its obligations[.]" Joint SOF ¶ 14. The parties, recall, only entered into the Third Amended Superseding Agreement after Sea Spine failed to meet its obligations under the Original Agreement, the Original Superseding Agreement, the Amended Superseding Agreement, the First Amended Superseding Agreement, and the Second Amended Superseding Agreement.[12] In other words, "[t]he Third

---

[12] *See* Joint SOF ¶ 6 ("During the course of the relationship, Sea Spine failed to comply with its obligations under the Original Agreement, as amended."); *id.* ¶ 14 ("Sea Spine failed to meet all of its

Amended Superseding Agreement merely extended the deadline for [the] Defendants to pay and set forth a new payment schedule. It did not change the amounts due and owing NHF. [And it] was executed on an expedited basis because [the] Defendants needed an extension of the payment schedule to avoid default." Cruz Decl. ¶¶ 10–12. The Defendants cite no evidence for their position that NHF insisted on an "expedited" execution of the Third Amended Superseding Agreement for some other, more sinister reason. And *no evidence* isn't enough to survive summary judgment. *See, e.g.*, *Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla. Mar. 28, 2022) (Altman, J.) ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contention[s.]"); *Versfelt v. Sanza Food Serv.*, 2022 WL 479881, at *12, *17 (S.D. Fla. Feb. 16, 2022) (Altman, J.) (granting summary judgment for the defendant in an employment-discrimination case because the plaintiff "presented no direct evidence of discrimination" and because "none of the evidence [the plaintiff] cite[d] support[ed] [his] claim"); *RLI Ins. Co. v. Alfonso*, 2021 WL 430720, at *22–24 (S.D. Fla. Feb. 8, 2021) (Altman, J.) (discussing the Eleventh Circuit's definition of "a scintilla of evidence" and granting summary judgment because the non-movant "failed to meet that standard").

To the contrary, as we've said, the parties have *stipulated* that NHF wanted to move quickly "to provide Sea Spine with an opportunity to comply with its obligations" in light of its prior defaults. Joint SOF ¶ 14. Again, this tells us nothing about whether NHF *knew* about Sea Spine's (purported) misunderstanding. On this point—NHF's knowledge—the only apposite piece of evidence in the record is this passage from the Cruz Declaration (which conclusively rejects any implication that NHF

---

contractual obligations under the Original Superseding Agreement by failing to collect and/or remit the minimum payments due by the second year after NHF's advance."); *id.* ¶ 20 ("Sea Spine failed to pay the full amounts due under the Amended Superseding Agreement on each of the dates set forth in [the] paragraphs . . . above."); *id.* ¶ 24 ("Sea Spine made some payments required in the First Amended Superseding Agreement, but failed to make all of the payments as required."); *id.* ¶ 27 ("Sea Spine made some payments, but failed to make all of the payments required by the Second Amended Superseding Agreement.").

had any such knowledge): "At no time prior to the Defendants' execution of the Second Amended Superseding Agreement or the Third Amended Superseding Agreement did [the] Defendants notify NHF that they were unaware of the amounts owed and needed additional time to determine the same." Cruz Decl. ¶ 11. As we've said, the Defendants never even try to rebut this assertion.

Where (as here) the party asserting unilateral mistake "present[s] no evidence" that "the other party knew of and unfairly took advantage of the [first] party's error," *Hartford*, 870 P.2d at 1207, Arizona law provides no relief.[13] For this separate reason, then, we **GRANT** the Plaintiff's MSJ.[14]

\*\*\*

For the two reasons we've given—Sea Spine's waiver and NHF's lack of knowledge—we enter judgment in NHF's favor. We add here only that, as we read Arizona law, it's not at all clear that, in the circumstances of this case, there was any mistake at all. That's because Arizona courts distinguish between genuine "mistakes"—the kind that would justify the rescission of an otherwise-enforceable contract—and "conscious ignorance." *Nelson v. Rice*, 12 P.3d 238, 242 (Ariz. Ct. App. 2000); *see also Deluca v. McMahon*, 2010 WL 682189, at \*4 (Ariz. Ct. App. Feb. 25, 2010) ("Buyers argue the principle of 'conscious ignorance' does not apply because Sellers were obligated to disclose defects in the

---

[13] There's also no evidence that the contract terms are ambiguous or that NHF induced Sea Spine's signature with some salient misrepresentations. *Cf. Ertl*, 502 P.3d at 472 (where the party challenging the contract "provided no evidence" that the contract was ambiguous, "she failed to prove a mistake that would void the parties' agreement as recognized in the resolution decree"); *Hendricks v. Simper*, 539 P.2d 529, 533 (Ariz. Ct. App. 1975) (rejecting defense of unilateral mistake where "there was no evidence of misrepresentations or ambiguity" since "[t]here [i]s no contention that [the contract's] terms [we]re not as read to them or [that they] in any way differ[] from the oral representations made by the defendants' agent"). To the contrary, in their Amended Answer, the Defendants repeatedly insisted "that the Third Amended Superseding Agreement speaks for itself and den[ied] any allegations and interpretations inconsistent" with that agreement. Amended Answer ¶¶ 38–41.

[14] The irony, of course, is that, if we were to give the Defendants what they want—*i.e.*, a finding that the Third Amended Superseding Agreement is unenforceable—then we'd have to order the Defendants to pay NHF *more*, not less. That's because, in that scenario, the parties' relationship would still be governed by the Second Amended Superseding Agreement, under the express terms of which—as NHF points out, *see* Reply at 8–10—the Defendants would owe $8,760,732.82, *see* Second Amended Superseding Agreement at 32.

property, including drainage issues and roof leaks. . . . On this record, we find no error in the superior

court's conclusion that Buyers' conscious ignorance of the adverse conditions precluded their claim

for rescission based on mutual mistake.").[15]

The general principle these cases rely on is straightforward: When a party is "aware that his

knowledge" of the terms of the contract is "limited[,] but undert[akes] to perform in the face of that

awareness, he bears the risk of the mistake." Restatement (Second) of Contracts § 154 (1981) cmt. c.[16]

In such cases, "there was no mistake but 'conscious ignorance.'" *Id.* And that's precisely what the

Arizona Court of Appeals held in *Nelson*. *See* 12 P.3d at 241–43. In that case, a decedent's estate hired

two appraisers—one of non-artwork artifacts, the other an expert in Indian art—to assess the value

of the estate's collection. *Id.* at 241. The estate's representatives "believ[ed] the [e]state contained

nothing of 'significant value' except the house and the Indian art collection." *Id.* "Despite the

knowledge that the [e]state contained framed art other than the Indian art, and that the [non-art

appraiser] was not qualified to appraise fine art, the personal representatives relied on [the non-art

appraiser] to notify them of any fine art or whether a fine arts appraiser was needed." *Id.* at 241–42.

"Because [the non-art appraiser] did not say they needed an additional appraiser, [the representatives]

did not hire anyone qualified to appraise fine art." *Id.* at 242. Unfortunately for the estate, the buyer

of one of the paintings—who, like the estate, originally believed the painting to be a reproduction—

---

[15] These cases (we recognize) all deal with claims of *mutual*, rather than *unilateral*, mistake. But, given that "[c]ourts have traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as a basic assumption, if the mistake is *not* shared by the other party," Restatement (Second) of Contracts § 153 (1981) cmt. A (emphasis added), we think these decisions apply with even greater force to cases like ours, where there is no allegation that the mistake was shared by NHF.

[16] Arizona courts frequently rely on the Restatement (Second) of Contracts. *See, e.g.*, *Ertl*, 502 P.3d at 472 (citing the Restatement (Second) of Contracts § 151 for its definition of unilateral mistake); *Renner v. Kehl*, 722 P.2d 262, 265 (Ariz. 1986) (citing the Restatement (Second) of Contracts § 152 for its views on unilateral mistake). And Arizona courts have relied on § 154 specifically. *See Nelson*, 12 P.3d at 242 (noting Arizona courts' reliance on the Restatement (Second) of Contracts § 152 for its definition of mutual mistake and relying on § 154 for its view that it was the court's job to allocate risk in cases of mistake).

later learned that it was an original and sold it at auction for more than $1 million. *Id.* After hearing about the sale, the estate sued the buyer, "alleging the sale contract should be rescinded or reformed on grounds of mutual mistake and unconscionability." *Id.*

The Arizona appellate court disagreed: "By relying on the opinion of someone who was admittedly unqualified to appraise fine art to determine its existence, the personal representatives consciously ignored the possibility that the [e]state's assets might include fine art, thus assuming that risk." *Id.* The court added that "the [e]state had ample opportunity to discover what it was selling and failed to do so; instead, [the estate] ignored the possibility that the paintings were valuable and attempted to take action only after learning of their worth as a result of the efforts of the [purchaser]. Under these circumstances, the [e]state was a victim of its own folly and it was reasonable for the [lower] court to allocate to it the burden of its mistake." *Id.*

We could say the same about our Defendants. Like the estate in *Nelson*, they admit that they had reason to doubt NHF's figures. *See* Seda Decl. ¶ 6 ("At the time [Sea Spine] and Appel had entered into the Third Amended Superseding Agreement, . . . . [Sea Spine] and Appel were aware that payments were made by [Sea Spine] to NHF and that NHF failed to properly apply [Sea Spine's] payments or otherwise properly account for [Sea Spine's] payments as required by the parties' agreements[.]"). But they elected to sign the contract anyway—*without* conducting any further diligence. *See id.* ("At the time [Sea Spine] and Appel had entered into the Third Amended Superseding Agreement, [Sea Spine] had not conducted an audit of the many thousands of accounts based on multiple dates of patient service that it sold to NHF, the amounts of NHF's advances to [Sea Spine] to purchase each account and the amounts [Sea Spine] collected and remitted to NHF under the parties' agreement for [Sea Spine] to provide servicing of the accounts for NHF."); *see also* Defs.' SOF ¶ 14 ("At the time [the] Defendants signed the Third Amended Superseding Agreement, [the] Defendants were aware [Sea Spine's] payments to NHF were not applied or improperly applied to sold accounts but [Sea Spine] was unable

to complete its audit of the accounts to determine the amounts owed before signing the Third Amended Superseding Agreement."). That the Defendants chose to sign the contract without conducting the necessary diligence isn't evidence of unilateral mistake—"a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract[.]" Restatement (Second) Contracts § 153 (1981). It's "conscious ignorance." *See id.* § 154 cmt. c. That's because "[a] party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient[.]" *Id.* § 154. Or, as the *Nelson* Court put it: "[T]he [e]state had ample opportunity to discover what it was selling and failed to do so . . . . Under these circumstances, the [e]state was a victim of its own folly and it was reasonable for the [lower] court to allocate to it the burden of its mistake." *Nelson*, 12 P.3d at 242. Substitute "Sea Spine" for "estate" and "selling" for "paying," and *Nelson* is on all-fours here.

## CONCLUSION

After careful review, the Court hereby **ORDERS and ADJUDGES** as follows:

1. The Plaintiff's Motion for Summary Judgment [ECF No. 45] is **GRANTED**.

2. Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

3. This case shall remain **CLOSED**.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELLED**.

**DONE AND ORDERED** in Miami, Florida, this 8th day of June 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record